# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

|  |  |
|---|---|
| | : |
| AB SCIEX LLC, D/B/A SCIEX, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :  Case No. 19-cv-12030 |
| | : |
| RAMI HADDAD and ZEF SCIENTIFIC, INC., | : |
| D/B/A ZEFSCI, | : |
| | : |
| Defendants. | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff AB SCIEX LLC, d/b/a SCIEX ("SCIEX"), by and through its undersigned attorneys, alleges as follows for its Complaint for Injunctive and Other Relief against Defendants Rami Haddad ("Haddad") and Zef Scientific, Inc., d/b/a ZefSci ("ZefSci") (collectively, "Defendants"):

## NATURE OF THE CASE

1.      This action is the result of Defendant Haddad failing to comply with certain promises and obligations he made when he executed the "Agreement Regarding Nondisclosure and Protection of Proprietary Interests" (the "Agreement") with SCIEX on or about January 23, 2010, and his misappropriation of SCIEX's confidential information and trade secrets, on information and belief with the aid or encouragement of his new employer, ZefSci.

2.      Specifically, Haddad agreed not to use or disclose SCIEX's trade secrets or confidential information to anyone outside SCIEX, and agreed to return all SCIEX documents and materials to SCIEX at the termination of his employment.

3.      Notwithstanding these covenants, Haddad secretly downloaded confidential SCIEX information shortly before submitting his resignation to SCIEX to join ZefSci, a direct SCIEX competitor.  Forensic examinations to date have revealed that Haddad subsequently transferred confidential documents to external drives and that identical copies of those documents currently exist on his ZefSci computer.

4.      However, despite entering into a forensic protocol with SCIEX to allow SCIEX to understand where its information may have been disseminated throughout ZefSci's systems, the Defendants have since stalled and reneged on their agreement to run search terms across the relevant devices.

5.      Thus, upon information and belief, Haddad, with ZefSci's knowledge, aid, and/or encouragement, has misappropriated SCIEX's confidential information and trade secrets, for his own benefit and the benefit of ZefSci, in violation of the Agreement, the federal Defend Trade Secrets Act, 18 U.S.C. § 1832, *et seq.* ("DTSA"), and the Massachusetts Trade Secrets Act ("MTSA"), Mass. Gen. Laws c. 93 §§ 42 and 42A (inserted by St. 1967, c. 817).[1]

6.      Likewise, ZefSci's conduct constitutes tortious interference with Haddad's Agreement with SCIEX, violations of the DTSA and MTSA, and unfair and deceptive acts under Mass. Gen. Laws § 93A.

7.      SCIEX respectfully asks the Court to enter an order prohibiting Defendants from retaining, using, or disclosing any SCIEX confidential information or trade secrets.  SCIEX also asks the Court to order the Defendants to submit to a forensic examination.  Finally, SCIEX asks

---

[1] Given that the alleged misappropriation commenced prior to the enactment of the Uniform Trade Secrets Act on October 1, 2018, SCIEX makes this claim under the prior version of that statute, which continues to apply to pre-October 2018 conduct.

this Court to prohibit Defendants from soliciting SCIEX customers during the pendency of this action.

## THE PARTIES AND RELEVANT ENTITIES

8.      SCIEX is a Delaware limited liability corporation with its principal place of business located in Framingham, Massachusetts.

9.      On information and belief, Haddad is a citizen of the Commonwealth of Massachusetts and resides at 99 Winterbury Lane, North Easton, Massachusetts.

10.      On information and belief, ZefSci is a Massachusetts corporation with a principal place of business in California.

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction over this dispute, pursuant to 28 U.S.C. § 1331, because SCIEX's claim against Defendants under the federal Defend Trade Secrets Act, 18 U.S.C. § 1832, *et seq*., raises a federal question. SCIEX's remaining claims fall within the Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, because the claims are so related to the federal question that they form part of the same case or controversy.

12.      This Court has personal jurisdiction over Haddad because he is a citizen and resident of Massachusetts.  This Court has personal jurisdiction over ZefSci because it is a Massachusetts company.

13.      Venue is proper in the United States District Court for the District of Massachusetts, pursuant to 28 U.S.C. § 1391(b), because Defendants reside in this District and a substantial part of the events giving rise to SCIEX's claims occurred in this District.

## BACKGROUND

### SCIEX's Business and Protection of its Confidential Information and Trade Secrets

14.     SCIEX is a global leader in mass spectrometry.  Among other things, SCIEX's innovations help protect the environment and our global food supply, advance the understanding of diseases, enable researchers to improve clinical tests, and empower pharmaceutical companies to develop more effective drugs. SCIEX also provides service maintenance, instrument qualification, software validation, and similar services for its products.

15.     SCIEX's global leadership and world-class service and support in the capillary electrophoresis and liquid chromatography-mass spectrometry industry have made it a trusted partner to thousands of scientists and lab analysts worldwide who are focused on basic research, drug discovery and development, food and environmental testing, forensics and clinical research.

16.     With over 40 years of proven innovation, SCIEX excels by listening to and understanding the ever-evolving needs of its customers to develop reliable, sensitive and intuitive solutions that continue to redefine what is achievable in routine and complex analysis.

17.     In order to maintain an edge in the highly competitive life science technology industry, SCIEX has spent decades and millions of dollars developing its trade secrets and confidential information.  This information includes, but it not limited to: proprietary software tools for advanced data mining enabling SCIEX to troubleshoot instrument issues, processing and quantitation software and instrumentation for basic research, drug discovery and development, clinical research, forensics, and food or environmental testing; technical design and development information, service manuals and troubleshooting guides, and diagrams regarding its products; customer contact information and preferences; and pricing information.

18.     SCIEX protects its confidential information and trade secrets by, among other things: limiting the disclosure and use of this information to only the SCIEX employees who need

the information to perform their roles for SCIEX; educating its workforce about the requirement and necessity of keeping this information confidential; limiting access to this information by restricting access to computer networks and requiring the use of passwords to access the information; and, as discussed below, requiring employees with access to such information to execute written agreements that protect against the misuse and improper disclosure of SCIEX confidential information.

19.     As a result of these measures, SCIEX's confidential and proprietary trade secret information is not available to the general public and is closely guarded by SCIEX. SCIEX keeps such information strictly confidential in order to maintain a competitive advantage in the highly competitive life science technology industry. The time, expense, and effort that goes into the development of SCIEX confidential and proprietary information (and training employees on how to use such information for the benefit of the SCIEX customer) is such that the independent development of identical or comparable materials by SCIEX competitors would be extraordinarily difficult and expensive.

**Haddad's Employment with SCIEX**

20.     SCIEX hired Haddad as a Field Sales Engineer in 2010 when SCIEX acquired Haddad's prior employer. In this role, Haddad was responsible for servicing all SCIEX products directly with SCIEX customers and selling certain SCIEX products directly to customers in the New England region. As a result, Haddad had access to SCIEX's confidential information, including but not limited to software, technical information, service manuals, diagrams, business strategy plans, sales strategies, pricing plans and information, product defect and repair rates, customer relationship information, marketing strategies, development plans, and more.

21.     Haddad executed the Agreement with SCIEX on or about January 23, 2010 in connection with his new employment with SCIEX.  (A true and correct copy of the Agreement is attached hereto as <u>Exhibit A</u>).

22.     The Agreement provides at Section 1 as follows:

> **1. <u>Protection of Confidential Information</u>**.    During and after my employment, I will not directly or indirectly utilize or disclose to anyone outside of the Company trade secrets or other confidential information of the Company (including confidential information entrusted to the Company by any third party or which was developed in the course of, or as a result of my employment with the Company) so long as such information is not generally known to the public. Examples of confidential information include, but are not limited to, customer and supplier lists, pricing, margins, business and marketing plans and strategy, technical know-how, formulae, processes, designs, manufacturing techniques and software.

23.     Additionally, Section 2 of the Agreement provides:

> **2. <u>Return of Property</u>.** All documents and materials supplied to me or developed by me in the course of, or as a result of my employment at the Company shall be the sole property of the Company. I will at the Company's request or upon termination of my employment, return all originals and copies of Company property to the Company.

24.     Haddad agreed pursuant to Section 5 of the Agreement to provide the Agreement to any subsequent employers.

25.     Section 6 of the Agreement further provides:

> **6. <u>Injunctive Relief</u>.** I acknowledge and agree that the Company has the right to seek injunctive relief in addition to all other remedies at law for any violation by me of my obligations in this Agreement.

26.     On or about February 14, 2014, Haddad requested a transfer to another district. SCIEX agreed, and transferred Haddad to Arizona mid-2014.  While working for SCIEX in Arizona, Haddad gained access to customer accounts in Southern California, Arizona, New Mexico and Nevada.  On January 28, 2015, Haddad moved back to Massachusetts and resumed his responsibilities for the New England region.

**Haddad Resigns from SCIEX**

27.     In the afternoon of September 20, 2018, Haddad informed SCIEX by email that he was resigning effective October 4, 2018, and that he would be joining ZefSci as a manager for service for the Northeast region.

28.     ZefSci is a direct competitor of SCIEX. ZefSci's website describes itself as "a premier independent engineering and scientific organization specializing in state of the art chromatography and mass spectrometry." *See https://www.zefsci.com/about/* (last visited Aug. 27, 2019).  Like SCIEX, ZefSci provides service maintenance, instrument qualification, software validation, and similar services for clients in the life science technology industry.

29.     In fact, ZefSci, through its counsel, recently admitted that "ZefSci, like SCIEX, services and repairs certain SCIEX laboratory equipment, primarily mass spectrometry and liquid chromatography equipment. . . . . In short, ZefSci and SCIEX in part, do the same thing, with the same equipment, for the same potential customers, in the same market . . . ."

30.     Given the similarities in Haddad's description of his anticipated role with ZefSci to his position with SCIEX, and in light of the voluminous confidential and trade secret information to which he had access as a SCIEX employee, SCIEX became concerned that Haddad's employment with ZefSci would cause him to inevitably disclose SCIEX's confidential information.

31.     As a result, on September 20, 2018, in response to Haddad's resignation, SCIEX sent Haddad a letter reminding him of his obligations under the Agreement, and enclosing a copy of the Agreement.  The letter also reminded Haddad of his obligation to provide a copy of the Agreement to his new employer. (A true and correct copy of the September 20, 2018 is attached hereto as Exhibit B).

32.     The following morning at approximately 10:00 a.m., less than 24 hours after Haddad provided his notice to SCIEX, SCIEX terminated his access to its systems due to the competitive nature of his anticipated employment with ZefSci.

### SCIEX's Forensic Examination and Demand to Haddad

33.     As a result of its serious concerns, SCIEX undertook a forensic examination of Haddad's SCIEX work computer.

34.     The results of SCIEX's forensic examination were alarming to SCIEX.  For example, the examination revealed that just prior to submitting his resignation in September of 2018, Haddad downloaded numerous confidential SCIEX files to his work computer.  Among the information that Haddad downloaded was confidential and proprietary: SCIEX software that it charges thousands of dollars to license, proprietary parts designs that could enable another company to manufacture parts to compete in the third party market with SCIEX, proprietary service manuals created by SCIEX to enable its employees to best service SCIEX instruments against its competition, installation guides, multiple product troubleshooting software programs, vendor computer license keys, customer information, software installation keys, competitive "battlecards" (e.g. how SCIEX will position its products or services to win against its competition), SCIEX time and material rates, confidential pricing and services offering information on a customer-by-customer basis, cost information, and more.

35.     In fact, many of the documents downloaded by Haddad just prior to his resignation contained confidential customer information, including contracts showing customer contact information, contract dates (which would allow a competitor to solicit a customer when it knew the customer's contract with SCIEX was set to expire), contract terms, order details, pricing

information, and other information that would unfairly allow a competitor to undercut SCIEX or poach its customers by using non-public, confidential information.

36.     The forensic examination also revealed that Haddad had inserted three USB devices into his SCIEX work computer on September 16 and 17, 2018, and that he saved files from his SCIEX computer to two of the three USB devices, a Seagate "BUP Slim BK" drive (the "Seagate Device") and a SanDisk Cruzer Mini USB drive (the "SanDisk Device") (collectively, the "USB Devices").

37.     These files included confidential SCIEX information.  For example, the Seagate Device contained numerous confidential files in a folder entitled "7boos," including proprietary software tools, technical design and development information, service manuals and troubleshooting guides, diagrams regarding SCIEX products, customer contact information and preferences, and pricing information.

38.     There was no business justification for Haddad to have downloaded or transferred this proprietary information, particularly given his impending resignation, nor, upon information and belief, was it his typical practice to do so.

39.     On information and belief, at the time of Haddad's downloading and transferring conduct, which was just days before he submitted his resignation to SCIEX, he was well aware of his plans to join ZefSci.

40.     As a result of the forensic examination that SCIEX conducted, on December 7, 2018, SCIEX, through counsel, sent a letter to Haddad outlining its concerns regarding his conduct, and demanding that he immediately return the three USB devices and confirm what, if any, confidential SCIEX information was copied or accessed from those devices.  A true and accurate copy of the letter is attached hereto as Exhibit C.

41.     SCIEX's December 7, 2018 letter also demanded that Haddad provide a written certification under the penalties of perjury: 1) describing the actions he had taken in violation of the Agreement, whether ZefSci was aware of those actions, and what he and/or ZefSci had done to remedy the same; 2) attesting that he had not disclosed or used any confidential SCIEX information, or if he had, describing the same, whether ZefSci was aware of those actions, and what he and/or ZefSci had done to remedy the same; and 3) describing the affirmative steps, if any, taken by Haddad and/or ZefSci to ensure Haddad's employment with ZefSci would not violate the Agreement or jeopardize SCIEX's confidential information.

42.     Simultaneously with its December 7, 2018 letter to Haddad, SCIEX sent a letter to ZefSci, putting it on notice of the results of SCIEX's forensic examination of Haddad's computer. SCIEX asked ZefSci to conduct a reasonable search of its systems to confirm that no confidential SCIEX information was received from Haddad, and asked ZefSci to provide written confirmation of the same by December 14, 2018, with a description of the repositories searched.   A true and accurate copy of the letter is attached hereto as Exhibit D.

43.     In response, on December 13, 2018, ZefSci, through counsel, sent a letter to SCIEX's counsel. A true and accurate copy of the letter is attached hereto as Exhibit E.  This letter stated that while ZefSci's counsel did not represent Haddad, SCIEX should consider the letter to be Haddad's response to SCIEX as well.

44.     ZefSci represented that it had "investigated" the matters described in SCIEX's December 7, 2018 letters and it was "confident" that Haddad had not used or disclosed any confidential SCIEX information, and that no such information had been transferred to ZefSci's systems.  However, ZefSci's response contained virtually no details as to the "investigation" that it had allegedly undertaken.

45.     On December 14, 2018, SCIEX, through its undersigned counsel, sent another letter to ZefSci's counsel, noting that ZefSci's December 13, 2018 response was inadequate for two reasons: first, ZefSci's response failed to acknowledge Haddad's conduct in transferring confidential SCIEX information to USB devices without authorization, and Haddad had failed to make the demanded certifications. Second, ZefSci's response failed to provide *any* detail on the affirmative steps (if any) taken to review ZefSci's systems and confirm that no SCIEX information had been transferred there.

### The Parties Agree to a Forensic Protocol

46.     Following the parties' exchange of letters in December 2018, the parties began to negotiate a forensic protocol to discover details of Haddad's conduct.

47.     On or about January 30, 2019, after extensive negotiations, SCIEX, Haddad, and ZefSci entered into a forensic protocol agreement (the "Protocol", attached hereto as Exhibit F). The Protocol provides that it was "Jointly Prepared By Counsel For Both Parties." *Id.* at p. 4.

48.     Pursuant to Section 1 of the Protocol, a forensic neutral (the "Neutral") would provide file listings of the USB Devices that Haddad had inserted into his SCIEX computer prior to resigning.

49.     Sections 2 and 3 of the Protocol also provided that the Neutral would provide a report of its examination of the USB devices as well as any computers used by Haddad during his employment with ZefSci (the "ZefSci Computer") (collectively with the USB Devices, the "Electronic Sources") to determine:

     a.   Any USB activity on the ZefSci Computer, including any evidence of opening, copying, moving, or otherwise accessing data from the USB Devices;

     b.   Any files present on the ZefSci Computer with matching names or SHA-1 hash

values[2] compared to the files found on the USB Devices;

     c.   Any evidence of mass deletion or wiping data on the Electronic Sources.

50.     Pursuant to Section 4 of the Protocol, following receipt of the Neutral's reports, the parties were to meet and confer on appropriate search terms for the Neutral to execute on the Electronic Sources.  Notably, in negotiating the Protocol, Defendants never requested that the search terms be limited to file names.

51.     The Protocol provided at Sections 5 and 6 that the Neutral would then execute the search terms and produce a search term report (a "Hit Report") listing the number of document search hits per term, a list of which documents had which search hit, and a listing of unique file names and locations that contained any search hit.

52.     Sections 6 and 7 of the Protocol also provided that the Neutral would deliver files containing search hits to the parties (first to counsel for Defendants for a privilege review, and then any non-privileged files to SCIEX within two business days of receipt of Defendants' privilege log).

53.     Section 10 of the Protocol provided that following SCIEX's receipt of the non-privileged files containing hits, counsel for SCIEX would have seven business days to review the same, and that within one day of the completion of its review, counsel for SCIEX would then deliver to the Neutral and Defendants' counsel a list of files that SCIEX contended were SCIEX property (the "SCIEX Data List").

---

[2] A hash value is a unique alpha-numeric string calculated by a hashing algorithm based on a file's content. Common hashing algorithms include MD5 and SHA-1. If two files contain identical MD5 or SHA-1 hash values, it is generally considered by forensics experts to be a reliable method to determine that the two files  contain identical content and are exactly the same in all respects.

54.    Section 10 of the Protocol further provided that Defendants would have three business days to review the SCIEX Data List and challenge the inclusion of files thereon.

55.    Finally, the Protocol provided at Section 11 that upon the parties' agreement that certain files on the SCIEX Data List should be remediated, the Neutral would take steps to permanently and irrevocably wipe such files from the Electronic Sources.

### Partial Analysis of the USB Devices and Haddad's ZefSci Computer

56.    Following their execution of the Protocol, the parties engaged Innovative Discovery, LLC to act as the Neutral, and executed a statement of work related to the Protocol on or about February 19, 2019.

57.    On February 25, 2019, the Neutral provided reports that listed all active, deleted, and recoverable files and folders from each of the USB Devices, including all available metadata for those files and folders.

58.    On February 28, 2019, the Neutral provided reports that identified a list of files on the ZefSci Computer with SHA-1 hash values that matched the SHA-1 hash values for files located on each of the USB Devices.

59.    Also on February 28, 2019, the Neutral provided a USB activity report summarizing the name and serial number of any removable devices that were connected to the ZefSci Computer on or after August 1, 2018, including any evidence of opening, copying, moving, or accessing data contained on those devices.

60.    On March 1, 2019, the Neutral provided the parties with a list of deleted files from the Electronic Sources. Many of the files listed had file names indicating that they originated with SCIEX and pre-dated Haddad's resignation, including documents that stored customer data, internal SCIEX intellectual property, and documents requiring explicit authorization from SCIEX

for use and/or distribution. SCIEX subsequently reviewed documents located on Haddad's SCIEX computer with identical SHA-1 hash values and confirmed that these files both originated with SCIEX and contained highly confidential SCIEX information. A list of the deleted files located on the ZefSci workstation can be found in Exhibit G,[3] and a list of the deleted files located on the SanDisk Device can be found in Exhibit H.

61.     On March 5, 2019, the Neutral provided the parties with a revised version of the report that identified a list of deleted files from the ZefSci Computer provided on March 1, 2019 that included supplemental information, where available, related to when a particular file was transferred to the Recycle Bin.

62.     The reports provided by the Neutral contain significant evidence that SCIEX data exists on the Electronic Sources, including the ZefSci Computer.

63.     For example, the Seagate Device – one of the USB Devices that Haddad had connected to the SCIEX computer and to which he had transferred files just days before resigning – contained over 92,000 files located within a folder entitled "7boos" and associated subfolders, the same folder that SCIEX's own forensic examination of Haddad's SCIEX computer in late 2018 identified as being a location on the Seagate USB Device that files and folders had been copied to from the SCIEX computer.

64.     Many of the files on the Seagate Device contained file names that indicate they originated with SCIEX and pre-dated Haddad's resignation, including documents that stored customer data, internal SCIEX intellectual property, and documents requiring explicit authorization from SCIEX for use and/or distribution. SCIEX reviewed documents located on Haddad's SCIEX computer with identical SHA-1 hash values and confirmed that these files both

---

[3] Exhibits G-L are the subject of a simultaneously-filed motion to seal.

14

originated with SCIEX and contained highly confidential SCIEX information. A list of these files can be found in <u>Exhibit I</u>.

65.     Likewise, the SanDisk Device – another of the USB Devices that Haddad had connected to the SCIEX computer just days before resigning – contained over 360 files, many of which contained file names and folders that indicate they originated with SCIEX and pre-dated Haddad's resignation, including documents that stored customer data, internal SCIEX intellectual property, and documents requiring explicit authorization from SCIEX for use and/or distribution. As with the Seagate Device, SCIEX also reviewed documents located on Haddad's SCIEX computer with identical SHA-1 hash values and confirmed that these files both originated with SCIEX and contained highly confidential SCIEX information. A list of these files can be found in <u>Exhibit J</u>.

66.     Indeed, of 6,662 files located on the SCIEX computer, 5,532 (or 83% of the files) existed on one or both of the USB Devices.

67.     Among the files with identical SHA-1 hash values that existed on *both* Haddad's SCIEX computer *and* at least one of the USB Devices were several SCIEX-developed and highly confidential schematic and parts references and diagrams showing SCIEX equipment from multiple angles.  These files would primary be used for SCIEX service engineers to identify parts during a repair.  These files included a warning that "[t]his document contains information proprietary and confidential to MDS SCIEX and is solely for customer's use in the operation of MDS SCIEX equipment.  Any use, disclosure, or reproduction of the information contained herein is strictly forbidden, except as MDS SCIEX may authorize in writing."  SCIEX never provided this document to ZefSci nor authorized ZefSci to use it.

68.     The Neutral's reports also revealed that on or after August 2, 2018, several external USB devices were connected to the ZefSci Computer, including:

a.    A "Seagate BUP Slim BK SCSI Disk Device" that was last connected to the ZefSci Computer on or after October 12, 2018.  The name of this device matches the Seagate device that was imaged by the Neutral, as well as the Seagate Device that SCIEX's own forensic analysis revealed had been inserted into the SCIEX computer just days prior to Haddad's resignation.

b.    A "SanDisk Cruzer Mini USB Device" that was last connected to the ZefSci Computer on November 13, 2018.  The Serial Number of this device matches the SanDisk Cruzer device that was imaged by the Neutral, as well as the SanDisk Device that SCIEX's own forensic analysis revealed had been inserted into the SCIEX computer just days prior to Haddad's resignation.

69.     The Neutral's reports also included a number of references to documents being accessed directly from external USB devices on the ZefSci computer. SCIEX reviewed documents located on Haddad's SCIEX computer with identical filenames and confirmed that these files both originated with SCIEX and contained highly confidential SCIEX information. A list of these files can be found in Exhibit K. On information and belief, the files accessed on Haddad's ZefSci computer from the USB Devices were the same files copied from the SCIEX computer to the USB Devices.

70.     According to the Neutral's report, there were over 9,000 documents located on the ZefSci Computer that had an *identical* SHA-1 hash value to documents located on either the Seagate Device or the SanDisk Device.

71.     Similarly, a comparison of the various devices examined reveals that an extraordinary number of exact copies of confidential and proprietary SCIEX files located on Haddad's SCIEX computer can be located on Haddad's USB Devices *and also* on Haddad's ZefSci computer.

72.     Finally, after analyzing the Neutral's report, SCIEX compared the SHA-1 hash values of documents located on the USB Devices *and* the ZefSci Computer and found 637 *identical* matches to documents located on Haddad's SCIEX workstation, including documents that contained highly confidential customer data.  A list of these files can be found in <u>Exhibit L</u>. The evidence uncovered to date thus indicates that it is highly likely Haddad copied confidential and proprietary SCIEX files from his SCIEX computer, to one of the two USB Devices, and then either copied to or accessed those files on the ZefSci Computer.

73.     Among these 637 files that were found on the SCIEX computer, at least one of the USB devices, *and* the ZefSci Computer were documents that Haddad would have no reason to have access to as a ZefSci employee, and indeed contained highly confidential and trade secret information.  By way of example only:

a.  Also among these files were approximately 185 highly confidential SCIEX service bulletins from the Global Service and Support Development group showing important new findings, guidance and instructions that supersede previous instructions and/or training for SCIEX products, and improve upon knowledge to better serve SCIEX's customers. They are intended for use *only* by SCIEX engineers and technicians in combination with official training classes, and are not shared with SCIEX customers, let alone competitors such as ZefSci.

17

    b.   Other documents that Haddad apparently moved from his SCIEX computer to the ZefSci Computer were confidential and proprietary schematics manuals, including a 120-page manual not just for a single subsystem, but an entire SCIEX instrument. These manuals are solely for the use of SCIEX service engineers to service instruments most efficiently and effectively for SCIEX's customers. Such manuals are not given to third-party servicers or SCIEX customers, unless paid for under limited and revocable licenses to use in extremely limited circumstances. Again, SCIEX never provided this document to ZefSci nor authorized ZefSci to use it.

74.    None of the aforementioned documents are available to the public, and SCIEX certainly did not authorize their disclosure to ZefSci, its competitor.

### Defendants Fail to Agree to Search Terms

75.    Shortly after receiving the Neutral's reports, and in connection with the terms of the Protocol, SCIEX submitted proposed search terms to Defendants, including both file names and 75 individual keywords (for content searching).

76.    Defendants initially did not provide input as to SCIEX's proposed search terms. In fact, Defendants' counsel only weighed in after counsel for SCIEX sent multiple reminders.

77.    Defendants' counsel finally responded that the ZefSci Computer should only be searched for actual file names from the USB Devices, and not the proposed keywords, which Defendants apparently deemed too broad and over-inclusive.

78.    While SCIEX disagreed with Defendants' characterization of the proposed keywords, it endeavored to limit the number of proposed keywords in a good faith effort to respond to Defendants' alleged concerns. Indeed, after careful consideration, SCIEX drastically limited its list of proposed keywords, and suggested that the Neutral search only for files that contained one

or more of seven keywords (*i.e.* Column A), *and also* one or more of seventeen keywords (*i.e.* Column B). In other words, if a file on the ZefSci Computer contained a keyword from Column A, but *no* keywords from Column B (or vice versa), it would *not* be considered a "hit."

79.     In sharing the revised proposed search terms, counsel for SCIEX expressed SCIEX's position that relying on file names alone as search terms would be insufficient. Indeed, such a search would be inadequate for a number of reasons:

    a.  A file that was merely renamed, even marginally, would not be identified through Defendants' proposal.

    b.  A file that had its content copied to a new document without the same file name would not be identified through Defendants' proposal.

    c.  A file that was placed into an archive or container (such as a ZIP file or PST email archive) would not be identified through Defendants' proposal.

80.     Defendants' counsel did not provide a substantive response to SCIEX's revised proposal for weeks. Indeed, after SCIEX provided the revised proposed search terms on May 6, 2019, and after following up over a week later on May 14, 2019, counsel for Defendants responded on May 15, 2019 that he was scheduled to speak with ZefSci the following day and would respond thereafter.

81.     Nonetheless, counsel for SCIEX was required to follow up again on May 23, 2019, more than a week after counsel for Defendants' email.

82.     Counsel for Defendants finally replied to SCIEX's counsel on May 29, 2019 – more than three weeks after SCIEX had sent its revised proposed search terms – suggesting that the parties discuss the same on a call the following morning.

83.     Despite the parties' discussion regarding the necessity of search terms, Defendants continued to delay for several weeks.  Indeed, counsel for SCIEX followed up with counsel for Defendants on June 5, June 20, and July 2, expressing SCIEX's frustration with the delay.

**Defendants Abruptly Abandon the Protocol**

84.     Finally, on July 2, 2019, Defendants' counsel responded substantively to SCIEX's repeated requests.  However, rather than agreeing to SCIEX's significantly limited proposed search terms (or making some counterproposal as to search terms), counsel for Defendants proposed instead that the parties "me[e]t directly to discuss the matter and come to a final resolution."

85.     In response, counsel for SCIEX noted that without completing the Protocol – which the parties had negotiated together and agreed to over five months prior – SCIEX would not agree to a sit-down meeting with Defendants.

86.     However, Defendants continued to refuse to complete the Protocol, and notwithstanding SCIEX's previously stated refusal to have a sit-down meeting prior to completion of the Protocol, Defendants' counsel again requested that the parties "wait on the protocol" until an in-person meeting took place.

87.     On August 2, 2019, SCIEX responded through counsel, reiterating that SCIEX would not consider a meeting until the results of the Protocol were shared, and until ZefSci accounted for the presence of SCIEX data on ZefSci's network.  Because of Defendants' stonewalling on completion of the Protocol, SCIEX became even more concerned, and not only reiterated its demand that Defendants complete the Protocol, but demanded that ZefSci agree, among other things, to (1) suspend Haddad until the completion of the Protocol; (2) describe any steps taken to preserve relevant data and to investigate whether Haddad had used, transmitted, or

shared SCIEX information with ZefSci; and (3) accept SCIEX's proposal regarding search terms. A true and accurate copy of this correspondence is attached hereto as Exhibit M.

88.     Defendants failed to respond substantively for two weeks.  First, Defendants' counsel emailed on August 7, 2019 that he would speak with Defendants the following day and have a response thereafter.  Defendants' counsel then emailed again on August 9, 2019, representing that he had spoken with his client and was planning to have a response by August 12, 2019.

89.     On August 13, 2019, after hearing nothing from Defendants' counsel, SCIEX's counsel again requested an update.  In response, Defendants' counsel emailed that he would have a response by August 16, 2019.

90.     Finally, on August 16, 2019, ZefSci provided its response through counsel, a true and accurate copy of which is attached as Exhibit N.  In this response, ZefSci largely rebuffed each of SCIEX's demands, *again* insisting on an in-person meeting in lieu of consummation of the parties' jointly negotiated Protocol.

91.     Counsel for SCIEX informed Defendants' counsel that the August 16, 2019 response was wholly inadequate.  Counsel for the parties then spoke by phone on August 20, 2019, in an attempt to resolve their differences, during which call SCIEX's counsel reiterated its concerns.  In response, Defendants' counsel indicated he was scheduled to speak with ZefSci that afternoon.

92.     The following day, Defendants' counsel represented that he hoped to have a further response by the next day, August 22, 2019.

93.     Defendants' counsel spoke with SCIEX's counsel on August 22, 2019 by telephone, and proposed (among other things) mediation in lieu of completion of the Protocol.

SCIEX's counsel indicated that Defendants' proposal was too vague, and requested a written proposal from Defendants.  Counsel for Defendants agree to provide the same by August 23, 2019.

94.     Despite Defendants' counsel's agreement to put Defendants' specific proposal in writing by August 23, 2019, no such proposal was provided.  SCIEX's counsel reached out again on August 26, 2019, and Defendants' counsel responded, promising a letter that same day.

95.     Defendants – yet again – failed to provide a written proposal to SCIEX on August 26, 2019, as promised.

96.     Instead, Defendants finally responded on August 28, 2019.  To SCIEX's dismay, Defendants' August 28, 2019 correspondence was deficient in several ways, including:

   a.  Defendants had yet again failed to counter-propose search terms, and instead appeared to confirm that they were abandoning the Protocol, which requires the parties to agree to search terms to be executed on the Electronic Sources;

   b.  Defendants offered to have Haddad certify that he had not used, disclosed, or transferred SCIEX data to ZefSci systems, but failed to agree to provide a similar certification from ZefSci that it was not in possession of SCIEX data; and

   c.  Defendants again refused to provide any details as to ZefSci's alleged investigation of Haddad's conduct, instead merely stating that "ZefSci confirms that the SCIEX data taken by Mr. Haddad has not been used by him in his work with ZefSci and was not copied off his laptop;" and

   d.  Defendants failed to put Haddad on leave pending completion of the Protocol.

97.     On August 30, 2019, counsel for SCIEX sent Defendants' counsel correspondence yet again laying out these concerns and demanding that Defendants, among other things, agree to complete the Protocol.

98.     Despite SCIEX's insistence that Defendants provide a proposal in writing, Defendants continued to refuse to do so.  After several attempts to connect by phone, the parties' counsel finally connected on September 5, 2019, during which call counsel for Defendants represented that he expected to provide a "detailed" response the following day, September 6, 2019.

99.     Instead, Defendants' counsel merely left a voicemail late in the day on September 6, indicating that Defendants' written response would not be ready until the following Monday, September 9, 2019.

100.    Finally, on September 9, 2019, Defendants' counsel sent a written response, a copy of which is attached hereto as Exhibit O.

101.    To SCIEX's disappointment, this correspondence was again inadequate, and indeed contained a number of misstatements and evasive responses.

102.    By way of example only:

a.  Defendants' counsel stated that Defendants had retained a forensic consultant, Mike Kunkel ("Kunkel") to "confirm" that Haddad had not uploaded *any* files through ZefSci's "single point of entry" to share files.  Not only is it highly suspect that ZefSci would have no shared network spaces, and that Haddad would not have uploaded *any* files to ZefSci's systems over the span of five months, but Kunkel only reviewed Haddad's account from October 1, 2018 on, ignoring whether he might have uploaded files prior to that date.  Notably, Kunkel did *not* confirm that the Citrix ShareFile service was the only method to share files between ZefSci employees.

b.   Indeed, conspicuously absent from Defendants' correspondence was any indication that they had conducted a review of Haddad's email account to see if he had shared SCIEX data that way.

c.   Moreover, Defendants' correspondence misconstrued - perhaps intentionally - the timeline of events, falsely suggesting that SCIEX was aware *on the dates that Haddad unlawfully transferred SCIEX information* of such conduct, but chose to delay in a nefarious plot to "meddle in ZefSci's internal workings and gain information about a competitor under the guise of protecting its own information." To the contrary, SCIEX was not aware of Haddad's unlawful conduct until after it received the results of its forensic examination, after such conduct (and after Haddad's termination).

d.   Defendants also falsely claimed that "knowing that Mr. Haddad was resigning to go work for a competitor, SCIEX apparently either did not take any affirmative steps to protect its asserted confidential information or assure itself that Mr. Haddad had abided by his confidentiality obligations before or concurrent with his departure." Nothing could be further from the truth. As noted above, while Haddad had indicated on September 20, 2018 that his intended last day would be October 4, 2018, SCIEX promptly terminated his access to its systems and terminated his employment *within hours*. It then undertook a forensic examination of his SCIEX computer, and once faced with the results, sought assurances from Haddad and ZefSci - assurances which never came.

e.   As evidence of its "good faith," ZefSci touted the fact that it "entered into the search protocol" - which it has notably refused to consummate.

24

f.   Additionally, despite ZefSci's claim that it "offered to provide reasonable certifications under oath," it had never previously offered such certifications on *ZefSci's* behalf, nor had it ever provided even a shred of detail to support its "confirmation" that Haddad had not uploaded SCIEX information.

103.   On information and belief, Defendants' steadfast refusal to continue with the Protocol is due to Defendants' knowledge that such an examination will reveal their unlawful misdeeds.

## Irreparable Harm to SCIEX

104.   To date, Defendants' conduct has caused SCIEX significant damage.  To wit, SCIEX has spent thousands on the forensic examinations described herein, and has lost hundreds of thousands of dollars in customer revenue from key customers that have moved their business to ZefSci following Haddad's resignation.  On information and belief, such customers have been convinced to terminate their relationship with SCIEX through Defendants' misuse of SCIEX's information.

105.   However, in addition to the foregoing, by violating the Agreement, Haddad is continuing to harm SCIEX's legitimate business interests by using misappropriated SCIEX confidential information, on information and belief, for ZefSci's benefit.

106.   Additionally, on information and belief, ZefSci has knowingly benefitted from Haddad's misappropriation, and has aided, encouraged, or directed said misappropriation.

107.   SCIEX's trade secrets, confidential information, and goodwill are therefore at risk because Defendants are refusing to return SCIEX property, and are further refusing to cooperate with SCIEX's attempts to discover how its information has been misused.

108.   SCIEX has no adequate remedy at law, and unless injunctive relief is granted, SCIEX will continue to be irreparably harmed by Haddad's breach of the Agreement and

Defendants' use of SCIEX's confidential information in a manner that is not fully compensable by money damages.  Injunctive relief is appropriate considering SCIEX's significant interest in its trade secrets and confidential information.

109.    SCIEX's customer relationships and goodwill are also threatened with irreparable harm if Defendants are permitted to misuse SCIEX's information.

110.    The harm to SCIEX's confidential information and customer relationships is neither knowable nor easily calculable in terms of monetary damages. Thus, SCIEX needs injunctive relief: (1) prohibiting Defendants from using SCIEX confidential information; (2) prohibiting Defendants from soliciting or performing work for SCIEX customers; and (3) requiring Defendants to submit to a full forensic examination and remediation effort.

### COUNT I
### (Breach of Contract - Against Haddad)

111.    SCIEX incorporates by reference the foregoing allegations of the Complaint as though fully stated herein.

112.    The Agreement is a valid and enforceable contract.

113.    SCIEX has performed all material obligations required of it under the Agreement.

114.    Haddad breached, and continues to breach, Sections 1 and 2 of the Agreement by failing to return SCIEX confidential information and, upon information and belief, using such information for his own benefit and for the benefit of his new employer, ZefSci.

115.    The post-termination covenant in the Agreement prohibiting Haddad from using or disclosing SCIEX's confidential information is reasonable and necessary to protect SCIEX's legitimate business interests in its confidential information, goodwill, and longstanding customer relationships.

116.    As a direct and proximate result of Haddad's breaches of the Agreement, SCIEX has been harmed and continues to be harmed.  Specifically, SCIEX's confidential information and trade secrets, as well as its customer relationships and goodwill, are threatened with irreparable harm by Haddad's conduct.

117.    SCIEX has been harmed, and continues to be harmed, by Haddad using SCIEX's confidential information and trade secrets to compete with SCIEX.

118.    SCIEX seeks compensatory damages and injunctive relief that requires Haddad to stop using SCIEX confidential information and immediately return all SCIEX confidential information to SCIEX.

## COUNT II
## (Tortious Interference With Contractual Relations - Against ZefSci)

119.    SCIEX incorporates by reference the foregoing allegations of the Complaint as though fully stated herein.

120.    ZefSci knew, or should have known, of the existence of the Agreement between SCIEX and Haddad.

121.    Haddad has breached the Agreement.

122.    Upon information and belief, ZefSci intentionally, and with improper motive or means, interfered with the Agreement by aiding, directing, and/or encouraging Haddad to breach the Agreement, in an effort to obtain and use SCIEX's confidential information for ZefSci's own benefit.

123.    As a direct and proximate result of ZefSci's conduct as alleged herein, SCIEX has been harmed, and continues to be harmed.

124.     SCIEX seeks compensatory damages and injunctive relief that requires ZefSci to stop using SCIEX confidential information and immediately return all SCIEX confidential information to SCIEX.

## COUNT III
### (Violation of the Federal Defend Trade Secrets Act, 18 U.S.C. §§ 1832, *et seq.* - Against Both Defendants)

125.     SCIEX incorporates by reference the foregoing allegations of the Complaint as though fully stated herein.

126.     During the course of his relationship with SCIEX, Haddad was provided access to substantial amounts of SCIEX confidential information.

127.     SCIEX confidential information is not available to the general public and is closely guarded by SCIEX. SCIEX keeps such information strictly confidential in order to maintain a competitive advantage over competitors.

128.     SCIEX's confidential information, including the information identified herein, is considered a "trade secret" under the Defend Trade Secrets Act, 18 U.S.C. § 1832, *et seq.* ("DTSA"), because the information is not generally known outside of SCIEX's business, SCIEX has taken reasonable measures to guard the secrecy of the information, the information is of great value to SCIEX and its competitors, SCIEX invested significant amounts of time and money in developing the information, the information cannot easily be acquired or duplicated by others, and because SCIEX continuously uses the information in its business.

129.     The economic value of the SCIEX trade secrets/confidential information Haddad had access to under his SCIEX Agreement is several millions of dollars.

130.     Haddad misappropriated SCIEX's trade secret information by improperly downloading the same for no valid business reason and despite knowing that he was not authorized

to retain the same, and subsequently transferring the information to multiple USB devices, shortly before he resigned from SCIEX to join ZefSci, a direct competitor.

131.   Haddad then connected the USB devices containing confidential SCIEX information to his ZefSci computer.

132.   ZefSci aided, encouraged, and/or directed Haddad to misappropriate SCIEX's trade secret information, in order to obtain an unfair competitive advantage over SCIEX.

133.   ZefSci acquired SCIEX's trade secret information from Haddad despite knowing that said information was obtained by Haddad through improper means.

134.   Despite their initial agreement to participate in a forensic examination intended to locate SCIEX's information, Defendants have since refused to proceed with the Protocol, in an apparent attempt to avoid discovery of their misconduct.

135.   Unless restrained, Defendants will use, divulge, and/or otherwise misappropriate SCIEX confidential information.  Indeed, upon information and belief, Defendants have used and continue to use SCIEX confidential information and trade secrets to compete with SCIEX.

136.   SCIEX requests an order enjoining Defendants from using any SCIEX confidential information, and from disclosing SCIEX confidential information to anyone not authorized to receive the confidential information.

137.   SCIEX also requests an order requiring Defendants to return any and all SCIEX confidential information to SCIEX.

138.   Finally, Defendants' misappropriation of SCIEX confidential information has been willful and malicious, and SCIEX has incurred significant damages as a result of this misappropriation of SCIEX confidential information.

139.   Defendants' actions have damaged SCIEX's legitimate business interests.

140.    SCIEX is therefore entitled to compensatory and exemplary damages in an amount to be proven at trial, as well as reasonable attorneys' fees.  SCIEX also seeks injunctive relief that requires Defendants to stop using SCIEX confidential information and immediately return all SCIEX confidential information to SCIEX.

**COUNT IV**
**(Violation of the Massachusetts Trade Secrets Act, Mass. Gen. Laws c. 93 §§ 42 and 42A**
**(Inserted by St. 1967, c. 817) and Common Law Misappropriation -**
**Against Both Defendants)**

141.    SCIEX incorporates by reference the foregoing allegations of the Complaint as though fully stated herein.

142.    During the course of his relationship with SCIEX, Haddad was provided access to substantial amounts of SCIEX confidential information.

143.    SCIEX confidential information is not available to the general public and is closely guarded by SCIEX. SCIEX keeps such information strictly confidential in order to maintain a competitive advantage over competitors.

144.    SCIEX's confidential information, including the information identified herein, is considered a "trade secret" under the Massachusetts Trade Secrets Act, because the information provides SCIEX economic advantage from not being generally known outside of SCIEX's business, is not readily ascertainable by proper means, and because SCIEX has taken reasonable measures to guard the secrecy of the information.

145.    Defendants misappropriated, exploited, and misused SCIEX's trade secrets and/or confidential and proprietary information to benefit themselves, in their own self-interest and to compete unfairly against SCIEX.

146.     The disclosure and use of such information by the Defendants constitutes a misappropriation of trade secrets and/or confidential and proprietary business information in violation of M.G.L. c. 93, §§ 42 and 42A, and common law.

147.     Upon information and belief, ZefSci knowingly benefited from Haddad's misappropriation of SCIEX's trade secrets.

148.     As a result of the Defendants' wrongdoings, SCIEX has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable injury due to the loss and use by the Defendants of its trade secrets and/or confidential information, for which there is no adequate remedy at law to compensate.

149.     By reason of the foregoing, SCIEX requires injunctive relief.  Unless injunctive relief is granted, SCIEX will be irreparably harmed in a manner not fully compensable by money damages.  In addition, SCIEX has been damaged in an amount to be determined at trial.

### COUNT V
### (Violation of Mass. Gen. Laws c. 93A - Against ZefSci)

150.     SCIEX incorporates by reference the foregoing allegations of the Complaint as though fully stated herein.

151.     SCIEX is a "person" and engages in "trade or commerce" within the meaning of Mass. Gen. Laws c. 93A, § 1.  ZefSci is a "person" and engages in "trade or commerce" within the meaning of M.G.L. c. 93A, § 1.

152.     The conduct constituting violations of M.G.L. c. 93A occurred primarily and substantially in Massachusetts.

153.     ZefSci's activities as set forth above constitute willful and knowing violations of M.G.L. c. 93A, §§ 2 and 11.

154.     Specifically, upon information and belief, ZefSci misappropriated SCIEX's trade secret information.  ZefSci also improperly delayed and refused to cooperate under the jointly negotiated and executed Protocol.

155.     As a result of ZefSci's violations of M.G.L. c. 93A, §§ 2 and 11, SCIEX has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable harm, for which there is no adequate remedy at law to compensate.

156.     By reason of the foregoing, SCIEX requires injunctive relief.  Unless injunctive relief is granted, SCIEX will be irreparably harmed in a manner not fully compensable by money damages.  In addition, SCIEX has been damaged in an amount to be determined at trial.

## COUNT VI
### (Breach of Contract - Against Both Defendants)

157.     SCIEX incorporates by reference the foregoing allegations of the Complaint as though fully stated herein.

158.     The Protocol is a valid and enforceable contract.

159.     SCIEX has performed all material obligations required of it under the Protocol.

160.     Defendants breached, and continue to breach, the Protocol by refusing to proceed with the terms thereof, including agreeing to search terms to be applied to the Electronic Sources.

161.     As a direct and proximate result of Defendants' breaches of the Protocol, SCIEX has been harmed and continues to be harmed.  Specifically, SCIEX's confidential information and trade secrets, as well as its customer relationships and goodwill, are threatened with irreparable harm by Defendants' refusal to complete the Protocol as promised.

162.     SCIEX has been harmed, and continues to be harmed, by Defendants' refusal to proceed with the Protocol, as it is unable to determine the extent to which the Defendants have misused SCIEX's information.

163.     SCIEX seeks compensatory damages and injunctive relief that requires Defendants to submit to a full forensic protocol.

**COUNT VII**
**(Breach of Implied Covenant of Good Faith and Fair Dealing - Against Both Defendants)**

164.     SCIEX incorporates by reference the foregoing allegations of the Complaint as though fully stated herein.

165.     Implied in the Protocol is a duty of good faith and fair dealing.

166.     Defendants owes SCIEX a duty of good faith and fair dealing in carrying out their obligations under the Protocol.

167.     By refusing to comply with the terms of the Protocol, and by repeatedly delaying completion of the same, Defendants have breached the covenant of good faith and fair dealing implied in the Protocol.

168.     Defendants' breach of the implied covenant of good faith and fair dealing has directly and proximately caused SCIEX to suffer damages, including but not limited to the costs incurred in attempting to complete the Protocol and in pursuing this action.

**WHEREFORE**, SCIEX respectfully requests that this Court:

1.     Enter an injunction enjoining and restraining Defendants, and their agents, representatives, associates, employees, and all those acting in concert or participation with them, from using any SCIEX confidential information for their own benefit and from disclosing SCIEX confidential information to anyone not authorized to receive the information;

2.     Enter an order requiring Defendants to submit to a full forensic examination of Haddad's electronic devices and accounts (including both personal devices and accounts and those used in connection with his work for ZefSci) as well as certain ZefSci repositories, including but not limited to:

a. Performing a search across Haddad's ZefSci mailbox for: (1) the filenames of any file located on either USB device, (2) any files that match the SHA-1 hash values for any of the files located on either USB device, and (3) the keywords proposed by SCIEX in May of 2019;

b. Performing a search across the entire ZefSci network shares and cloud-based storage platforms to which Haddad had access for: (1) the filenames of any file located on either USB device, (2) any files that match the SHA-1 hash values for any of the files located on either USB device, and (3) the keywords proposed by SCIEX in May of 2019;

c. Performing a search across Haddad's personal email account for: (1) the filenames of any file located on either USB device, (2) any files that match the SHA-1 hash values for any of the files located on either USB device, and (3) the keywords proposed by SCIEX in May of 2019;

d. Performing a search across Haddad's personal email account for any emails received from his SCIEX email account, and if such emails are identified, performing further analysis to determine whether those emails and any corresponding attachments were forwarded to other recipients;

3. Enter an order, during the pendency of this action and for a reasonable time thereafter, prohibiting Defendants from soliciting SCIEX customers with whom Haddad worked or had material contact or about whom he learned confidential information while a SCIEX employee;

4. Enter an order requiring Defendants to submit to expedited discovery;

5. Enter judgment against Defendants for compensatory damages in an amount to be determined at trial;

6. Award SCIEX the costs and expenses, including reasonable attorneys' fees, SCIEX incurs as a result of Defendants' misappropriation of SCIEX's information and ZefSci's violation of Chapter 93A;

7. Award SCIEX treble damages pursuant to Chapter 93A; and

8. Award SCIEX such other relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Respectfully submitted,

AB SCIEX, LLC, D/B/A SCIEX,

By its attorneys,

   */s/ Dawn Mertineit*
Katherine E. Perrelli (BBO #549820)
 kperrelli@seyfarth.com
Dawn Mertineit (BBO #669988)
 dmertineit@seyfarth.com
Dallin R. Wilson (BBO #676662)
drwilson@seyfarth.com
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, Massachusetts  02210
Tel: (617) 946-4800

Dated: September 27, 2019